**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Jan 23 2015, 10:01 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ANDREW J. HEDINGER**
Ippoliti Law Office, LLC
Ferdinand, Indiana

ATTORNEY FOR APPELLEES:

**STEVEN E. RIPSTRA**
Ripstra Law Office
Jasper, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ADOPTION OF K.L., )
                                           )
K.D.,                                       )
                                           )
        Appellant,                          )
                                           )
             vs.                             )      No. 14A05-1406-AD-288
                                           )
S.W. & M.W.,                          )
                                           )
        Appellees.                         )

### APPEAL FROM THE DAVIESS CIRCUIT COURT
The Honorable Gregory A. Smith, Judge
Cause No. 14C01-1309-AD-182

**January 23, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

K.D. ("Appellant"), the biological father of K.L., appeals the trial court's decree granting the petition for adoption of K.L. by S.W. and M.W. ("Adoptive Parents").[1] Appellant raises two issues, which we revise and restate as follows:

    I.       Whether the court erred in finding that his consent to the adoption was not required; and

    II.     Whether reversal is warranted on the grounds that the court failed to substantially comply with certain procedural requirements.

We affirm.

## FACTS AND PROCEDURAL HISTORY

K.L. was born on April 29, 2010, while her biological mother was an inmate at the Indiana Women's Prison. Adoptive Parents took custody of K.L. when she was two days old pursuant to a power of attorney provided by Stepping Stones Ministries, Inc., ("Stepping Stones") and executed by K.L.'s biological mother.[2] K.L.'s biological mother applied for certain government assistance through the Family and Social Services Administration ("FSSA") and, as required for persons seeking the assistance, initiated a paternity proceeding. According to Appellant, he first learned of the possibility of paternity in January 2011. In July 2011, Adoptive Parents were granted guardianship of K.L. under cause number 14C01-1107-GU-28 ("Cause No. 28"). Appellant was determined to be K.L.'s biological father "by Order dated November 3, 2011, which Entry was for October 12, 2011." Appellant's Appendix at 15. An order dated September 21, 2012 in Cause No. 28 provided in part that Adoptive Parents agreed to pay

---

[1] K.L.'s biological mother does not participate in this appeal.

[2] Stepping Stones is a prison ministry which assisted with the placement of children of incarcerated mothers.

2

travel costs while Appellant "is incarcerated at Henryville," that, "[u]pon release, [Appellant] is to pay costs of travel for visitation with his daughter and the court sets the cost at $50.00 for Daviess County visits and $150.00 if [Appellant] relocates to Evansville," that "[n]either parent is under an order of support and the travel payments will defray the costs of the child's travel," and that Adoptive Parents were "to arrange details of visitation."[3] Respondent's Exhibit C.

On September 4, 2013, Adoptive Parents filed a petition for adoption under this cause. In the petition, Adoptive Parents alleged that K.L. lived with her biological mother for about forty days, that the last period was before July 19, 2011, and that, to the best of their knowledge, K.L.'s biological mother never provided any support for the child. Adoptive Parents alleged that Appellant was incarcerated until January 2013, that his last contact with K.L., which was not significant, was arranged by Adoptive Parents while Appellant was incarcerated in December 2012, and that since Appellant's release in January 2013 he has not sought compliance with the terms imposed by the court and, to the best of their knowledge, never provided any support for the child. Adoptive Parents alleged that K.L. has lived nearly all of her life with them, that she came to their home when she was two days old, and that they became her legal guardians in July 2011 under Cause No. 28. Appellant objected to the adoption and termination of his parental rights.

On April 2, 2014, the court held a hearing on the petition for adoption at which it admitted documentary evidence of Appellant's criminal history, a November 3, 2011 order establishing paternity, certificates of completion related to transracial/transcultural

---

[3] Adoptive Parents are members of the Amish community, do not drive an automobile, and hire a driver for transportation.

adoption training by Adoptive Parents, a power of attorney executed by K.L.'s biological mother in favor of Stepping Stones Ministries and a document by Stepping Stones Ministries which certified Adoptive Parents as having power of attorney for K.L., certificates of completion indicating that Adoptive Parents successfully completed courses for pediatric first aid/CPR/AED, photographs of K.L., and certain medical records of K.L. The court also heard testimony from Appellant, a volunteer court appointed special advocate ("CASA"),[4] Adoptive Parents, a registered nurse who worked with a prison ministry organization, Stepping Stones' board chairperson, and a person who led a class regarding recovery in the facility where Appellant was incarcerated. Appellant indicated he was born on July 5, 1958, that he was currently incarcerated, that his projected release date was December 14, 2014, and that his "actual out date" would be August 6, 2014. Transcript at 21.

On June 10, 2014, the trial court entered a decree of adoption. The court entered findings of fact that Adoptive Parents had been the caregivers for K.L. for ninety-seven percent of her life, that Appellant has never had custody of the child, and that, even during the forty intermittent days when K.L. was with her natural mother, Adoptive Parents provided substantial funds for shelter which were paid directly to third parties. The court found that K.L.'s biological mother was not eligible for a program which could have allowed the child to stay at the prison for the remaining term of her sentence, that Adoptive Parents applied and were accepted by Stepping Stones Ministries as prospective

---

[4] The CASA indicated that she was assigned to the cases of two other children placed with Adoptive Parents by the Department of Child Services and that K.L. was not a part of the CASA program and was never a child in need of services, but that she had observed K.L. many times over several years when visiting Adoptive Parents' home.

4

caregivers, that Adoptive Parents had previously successfully provided foster care for several children, and that Adoptive Parents met K.L.'s biological mother at the prison before K.L.'s birth and took K.L. to the prison regularly, at least once a month, to visit her mother. The court found that K.L.'s biological mother was released from the Indiana Women's Prison on January 10, 2011, that upon release she resided at a recovery center until February 15, 2011 when she was dismissed for rule violations, and that she then moved to Evansville but did not maintain a regular residence. The court found that Adoptive Parents paid approximately $500 to third parties (motels and another responsible party) to try to ensure that K.L. would not be homeless and that K.L.'s biological mother repeatedly failed to provide suitable shelter, food, and care for K.L. The court found that Appellant was given due notice of the guardianship proceedings and participated by telephone during at least one hearing while incarcerated.

The court further found that K.L.'s biological mother applied for government assistance, that K.L. had been in her biological mother's care only intermittently for forty days, that K.L.'s biological mother initiated a paternity proceeding as required for persons seeking temporary assistance through FSSA, that K.L.'s biological mother retained the assistance and other benefits received even though K.L. had been permanently returned to Adoptive Parents, and that Adoptive Parents did not ask for or receive any of the temporary assistance funds. The court further found that, even though Appellant was aware of the birth of K.L. in January 2011, he did nothing to establish paternity or make contact with Adoptive Parents before paternity was established. The court found that there is no credible evidence Appellant "did anything in regard to the

paternity case other than provide a DNA sample while still incarcerated," that, after his release from incarceration and subsequent employment in January 2013, Appellant never made any effort to contact the courts to establish support, that Adoptive Parents took K.L. to see Appellant twice while he was still incarcerated, and that because Adoptive Parents are of the Amish faith, they paid for taxis to take K.L. to the prison without any reimbursement by Appellant. The court found that Appellant had been released from incarceration on parole for nearly two months before he made contact with Adoptive Parents' counsel sometime in March 2013, that after Appellant's release, counsel for Adoptive Parents asked that Adoptive Parents be reimbursed for travel expenses, and that, although employed, Appellant would not tender reimbursement and instead called Adoptive Parents' counsel and tried to arrange for Adoptive Parents to deviate from the court order.

The court found that Appellant "did not ever step up to facilitate visits with [K.L.,] then three (3) years old, to whom he was, and remains, a stranger," that "[a]fter [Appellant's] release in January 2013, he did not communicate at all with the child, in any manner, before the Petition for Adoption was filed, which was near the time of his arrest for the latest criminal offense," that "[t]he Court finds his asserted reasons of lack of means to visit with [K.L.] to be spurious," and that Appellant "testified that he was employed, provided for his own shelter, clothing, food, and transportation, yet provided nothing for [K.L.] and expended no sums to try to see her." Id. at 16. The court also found that, after the establishment of the guardianship throughout the date of the hearing on the petition for adoption, "the manner in which [Adoptive Parents] extended visitation

6

to [Appellant] was no different from that extended" to K.L.'s biological mother," that Appellant "simply took no proactive steps to visit [K.L.]," that "[a]ll he did was call the attorney for [Adoptive Parents] one or two times and ask her to deviate from the Court Order," and that "[h]is attitude is exemplified by 'Ask not what I can do for my child, but rather what can the [Adoptive Parents] do for me.'" Id. The court found that Appellant quit his job with a temporary service, that he said he began to work with "an off the books employer until his re-arrest in September 2013" for operating a motor vehicle while intoxicated, that he did not produce any record of his earnings during 2013, and that he stated he made no effort to file 2013 income tax returns. Id. The court found that, after several months, Adoptive Parents realized that it would be highly unlikely that Appellant would ever fulfill his duties to become a fit parent and filed their petition for adoption.

The court also found that Appellant's criminal history includes convictions for operating a motor vehicle while intoxicated in 2013; robbery as a class C felony and driving while license suspended in 2011; three counts of trespass, three counts of public intoxication, and conversion in 2010; two counts of driving while license suspended and public intoxication in 2009; possession of paraphernalia as a class D felony in 2008; possession of paraphernalia as a class D felony, driving while license suspended, and check deception in 2007; possession of cocaine and possession of paraphernalia as class D felonies in 2006; possession of paraphernalia as an infraction, maintaining a common nuisance as a class D felony, driving while license suspended, false or fictitious registration as an infraction, and operating a motor vehicle while intoxicated as a class D

7

felony in 2003; public intoxication in 2002; two counts of operating a motor vehicle while intoxicated and carrying a handgun without a permit as a class C felony in 2001; disorderly conduct as a class B felony in 2000; two counts of theft as class D felonies and dealing in a counterfeit substance as a class D felony in 1998; theft as a class D felony in 1997; carrying a handgun without a permit as a class C felony in 1995; residential entry as a class D felony in 1993; and carrying a handgun without a permit as a class D felony in 1991.

The court found that "[t]he most likely predictor of [Appellant's] behavior upon his projected release from incarceration in December 2014 is his history of inveterate criminal behavior," that Appellant "abandoned the child for a period in excess of six (6) months preceding the filing of the Petition for Adoption, and failed to meaningfully communicate with the child for a period greater than one (1) year," that Appellant's "communication efforts were, at best, token" and that, "[o]ther than the two (2) jail visits arranged and paid for by [Adoptive Parents], [Appellant] sent random cards, which he knew the child could not read" and "sent no gifts." Id. at 20. The court found that Appellant never provided any financial support for K.L. who was just four weeks shy of four years of age and that Appellant had a legal duty to do so even if there were no court order requiring him to do so. The court found that Adoptive Parents have three other children and an enormous close-knit extended family, all of whom accept K.L. as a member of the family, the extended families visit each week for gatherings lasting several hours, and that "[t]hese are the only persons known to [K.L.] as family." Id. The court found that a Daviess County volunteer CASA familiar with Adoptive Parents' home

testified as to "the wonderful care that [K.L.] now receives" and other foster children have benefited from in Adoptive Parents' home, that the CASA had visited the home many times, and that, should a child's behavior be inappropriate, there are no harsh words or physical punishments and the child "is talked with in a loving caring manner and the problem is corrected." Id. at 20-21.

The court found that a registered nurse employed by Stepping Stones made monthly visits to Adoptive Parents' home to see the child through July 2011, that K.L. had regular visits to the doctor and dentist, and that the nurse stated that the child had received excellent care in Adoptive Parents' home and had experienced nothing other than routine childhood illnesses. The court noted that Adoptive Parents admitted documents establishing they have been licensed foster parents for several years and that they have passed a background check which is updated annually. The court found that Adoptive Parents are capable of rearing and loving K.L. and providing suitable shelter, clothing, support and education for her, as they have virtually all of her life.

The court, in its conclusions, determined that Appellant has abandoned and deserted K.L. for a period exceeding six months prior to the filing of the petition for adoption and has not supported or significantly communicated with K.L. for over a one-year period prior to the filing of the petition for adoption even though he was able to do so. The court found that Adoptive Parents "have met their burden of proof to demonstrate abandonment and failure to support and failure to significantly communicate, as well as the unfitness of [Appellant] by clear and convincing evidence such that the consent of the [Appellant] is not required, and it is in [K.L.'s] best interest

9

to dispense with [Appellant's] consent." Id. at 24. The court terminated Appellant's parental rights with regard to K.L. The court further concluded that Adoptive Parents have been "the *de facto* parents" of K.L. since she was two days old, that they are capable of rearing and furnishing her with suitable support and education, and that the adoption of K.L. is in her best interest. Id. at 25. The court entered judgment denying Appellant's motion to contest the adoption, granting the adoption of K.L., terminating the parental rights of Appellant and K.L.'s biological mother, and ordering that K.L. shall for all intents and purposes be considered the natural child of Adoptive Parents and shall be entitled to the same rights and privileges to which she would be entitled if she were the genetic child of Adoptive Parents.

DISCUSSION

When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. In re Adoption of T.L., 4 N.E.3d 658, 662 (Ind. 2014). We presume the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision. Id.

When the trial court has made findings of fact and conclusions of law, we apply a two-tiered standard of review: we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. Id.; see Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the

10

credibility of the witnesses."). Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. In re Adoption of T.L., 4 N.E.3d at 662.

I.

The first issue is whether the trial court erred in finding that Appellant's consent to the adoption was not required. Appellant contends that the court erred in finding that his consent was not required pursuant to Ind. Code § 31-19-9-8. Ind. Code § 31-19-9-1 provides in part that, "[e]xcept as otherwise provided in this chapter, a petition to adopt . . . . may be granted only if written consent to adoption has been executed" by "[t]he mother of a child born out of wedlock and the father of a child whose paternity has been established . . . ." Ind. Code § 31-19-9-8 provides:

(a)     Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:

(1)     A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

(2)     A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A)     fails without justifiable cause to communicate significantly with the child when able to do so; or

(B)     knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

* * * * *

11

> (b)  If a parent has made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent.

The court here found that Appellant abandoned and deserted K.L. under subsection (a)(1) of Ind. Code § 31-19-9-8, that he failed to support or significantly communicate with K.L. under subsection (a)(2) of the statute, that his communication efforts were, at best, token, and that the adoption of K.L. by Adoptive Parents is in her best interests.

Appellant contends that the evidence does not support the court's findings. Appellant argues that he first learned of the possibility of paternity in January 2011, that he visited with the child on two occasions, that he sent cards to K.L. and, while she may not have been able to read, they were shown to K.L., and that he also attempted to communicate with his daughter by telephone but Adoptive Parents did not allow K.L. access to the phone, citing reasons of age and unfamiliarity with using a phone. Appellant argues that, during his release from incarceration from January 25, 2013 to October 18, 2013, he was juggling temporary employment, limited pay, housing, and transportation issues and that, according to the guardianship, if he wanted visitation he was required to pay for travel reimbursement. He further argues that he did everything he thought he could to arrange for any type of communication and was met with resistance every step of the way. Appellant also argues that he was not able to support K.L. while incarcerated or during the eight and one-half months he was released from prison but that this should not factor into the case. He asserts that he was unable to provide support due to his incarceration and that, even while released, he was juggling employment resulting

12

in pay of just six to seven hundred dollars. He also argues that he has worked to improve himself in prison and has now been released and that it is unfair to terminate his rights due to his previous criminal activity. Appellant finally contends as to K.L.'s best interests that not allowing K.L. to be adopted would not mean she would immediately be taken from her guardians and placed with him but rather that he could work on being part of her life in a way that was not unduly traumatic.

Adoptive Parents assert, as to Appellant's communication, that Appellant did not communicate, visit, care for or have contact with K.L. in any significant way throughout the first four years of her life. They argue that he saw K.L. only three times, one of which occurred when K.L.'s biological mother took K.L. to visit him in jail and the other two of which occurred when Adoptive Parents took K.L. to visit him in jail. Adoptive Parents argue that the evidence shows Appellant called Adoptive Parents one time when K.L. was two years old, that Appellant has never called while he was not incarcerated, and that Appellant did not visit K.L. during the eight months and two weeks between his release and re-arrest. They note that Appellant sent six or seven cards to K.L. after the filing of the adoption petition, which are irrelevant communications under the statute, and that, taken together, Appellant's very limited efforts at communication are in no way significant. Adoptive Parents also argue that, while Appellant asserts his efforts to communicate with K.L. were thwarted, there is nothing in the record that shows Adoptive Parents did anything other than care for and support K.L. With respect to support, Adoptive Parents further maintain that Appellant was working during the time he was out of jail, that he was able to provide for himself and to pay another daughter what he could

13

for living with her, and that he made no effort to provide in any way for K.L. Adoptive Parents note that Appellant had thirty-four criminal convictions on his record dating from 1991 and that Appellant will not likely be a stable, law-abiding parent capable of safely providing for K.L. Adoptive Parents also argue that adoption is in K.L.'s best interests as K.L. is a part of their family and is provided with certainty and stability.

In his reply brief, Appellant contends that Adoptive Parents fail to understand his hardships, "a parolee, trying to get his life back together and juggling temporary employment, limited income, and housing and transportation issues" and that "[g]iving [him] an 8.5 month window to 'prove himself' is hardly justifiable [to] sever[] a lifelong relationship between a child and her [f]ather." Appellant's Reply Brief at 3. He also argues that "the 'pay or lose out' provisions of the guardianship reimbursement" for visitation severely limited his ability to support his child or afford actual visitation. Id. at 4.

We note that the provisions of Ind. Code § 31-19-9-8 are written in the disjunctive and thus each provide independent grounds for dispensing with parental consent. In re Adoption of K.S., 980 N.E.2d 385, 388 (Ind. Ct. App. 2012). Regardless of which provision is relied upon, adoption is granted only if it is in the best interests of the child. Id. This court has held: "The subsections regarding significant communication, and regarding failure to support are framed in the disjunctive. Thus, demonstrating either of the two criteria is sufficient to establish that the adoption without parental consent may move forward." In re Adoption of J.P., 713 N.E.2d 873, 875 (Ind. Ct. App. 1999). In In re Adoption of J.P., we noted that "[s]ubsection (b) of the statute specifically allows a

14

court to find abandonment despite token communication by the parent." Id. We further noted that "[t]he thrust of the statute is to foster and maintain communication between non-custodial parents and their children, not to provide a means for parents to maintain just enough contact to thwart potential adoptive parents'[] efforts to provide a settled environment to the child" and that "[t]he significance of the communication is not measured in terms of units of visits." Id. at 876.

To the extent Appellant was incarcerated during part of the relevant one-year period under the statute, we have noted that imprisonment standing alone does not establish statutory abandonment." Lewis v. Roberts, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986). However, "[n]either should confinement alone constitute justifiable reason for failing to maintain significant communication with one's child." Id. Incarceration "unquestionably alters the means for significant communication." Id. "What constitutes insignificant communication with a free parent may be significant in relation to an incarcerated parent with limited access to his child." Id.

Appellant agrees that Adoptive Parents became K.L.'s caregiver through Stepping Stones when K.L. was two days old, that K.L. has lived with Adoptive Parents for all of her life except for forty days that she was with her biological mother, and that K.L. was approximately three years and four months old at the time of the filing of the petition. Appellant states that he was released from incarceration on January 25, 2013, and was incarcerated again on October 18, 2013. Adoptive Parents filed their petition for adoption on September 4, 2013, and thus Appellant was not incarcerated during the six-month period immediately preceding the filing of the petition for adoption and in fact was

15

not incarcerated for approximately eight months and nine days preceding the filing of the petition.

With respect to significant communication with K.L., the record reveals that Appellant's contact or attempted contact with K.L. was nonexistent at times and at best sporadic. Appellant saw K.L. three times while he was incarcerated, one time when K.L.'s biological mother brought her to the jail when she was six to eight months old and twice when Adoptive Parents brought her to the jail. Appellant called Adoptive Parents "possibly [] one time" but did not speak to K.L. because she was two years old at the time. Transcript at 87. Appellant testified that the only communication he was allowed was sending cards to K.L. and that he sent "probably six or seven" cards. Id. at 38. Adoptive Parents showed the cards to K.L. When asked "so, the sole substance of your communication, then, other than the visits that were arranged by other people, and the cost that was born by other people, was sending certain cards, is that correct," Appellant answered "[y]eah, that's correct." Id. Appellant testified that he felt that, "since this whole proceeding has been going on, barriers have been put into place to reduce [his] contact with [his] daughter, and more so once [he] was released." Id. at 193.

Based upon the evidence most favorable to the trial court's decision and given our standard of review, we cannot say that the court erred in finding that, for a period of at least one year, Appellant failed without justifiable cause to communicate significantly with the child when able to do so under Ind. Code § 31-19-9-8(a)(2). See In re Adoption of J.P., 713 N.E.2d at 876 (holding that evidence was presented that fairly consistent, but brief, monthly visits by a parent with the child were not meaningful and that the trial

court did not err in determining that the parent's consent was not required pursuant to Ind. Code § 31-19-9-8); In re Adoption of T.H., 677 N.E.2d 605, 607 (Ind. Ct. App. 1997) (holding that the trial court did not err in determining that the parent had not engaged in significant communication with the child where the parent saw the child four times and did not see the child for over two years, and noting that, while the parent was going through a difficult time, the parent presented no evidence concerning his efforts to see his child, and the inconvenience of contacting the other parent did not amount to justifiable cause for not seeing the child).

With respect to providing for the care and support of K.L., "Indiana law imposes a duty upon a parent to support his children" and that "[t]his duty exists apart from any court order or statute." In re Adoption of M.A.S., 815 N.E.2d 216, 220 (Ind. Ct. App. 2004) (citing Irvin v. Hood, 712 N.E.2d 1012, 1014 (Ind. Ct. App. 1999)). The court found that Appellant "was employed, provided for his own shelter, clothing, food, and transportation, yet provided nothing for [K.L.] and expended no sums to try to see her." Appellant's Appendix at 16. Appellant indicated he did not make any voluntary contribution for the care of K.L. and testified there was a court order stating he was to provide insurance for K.L. and no child support, it was his intention to seek custody and he would have provided everything to her, his employment did not provide insurance, he did not have the money to afford insurance, and thus that he did not provide insurance for K.L. The court took judicial notice of the September 21, 2012 order entered in Cause No. 28, which provided in part that, upon his release from incarceration, Appellant was to "pay costs of travel for visitation with his daughter and the court set the cost at $50.00 for

17

Daviess County visits and $150.00 if [Appellant] relocates to Evansville." Respondent's Exhibit C. The order noted that Appellant was not "under an order of support." Id. Appellant testified that, after he was released from jail, he was a painter, did roofing work, and worked for a temporary service. He testified he worked "[o]ff and on" for "a month or two" at the temporary service, which was a minimum wage job, and earned "probably Three to Four Hundred Dollars" over the course of two months. Transcript at 165. He further stated he did painting, drywalling, and cleaned apartments, from about July 17th until October 21st, working five days and sometimes six days, up to twelve hours a day. He testified that his rate of pay was based on how many units his company did, he was not paid regularly, he was usually paid in cash, he is owed around thirty-eight hundred dollars, he probably received six or seven hundred dollars for the whole time he worked there, and that he did not receive W-2 statements from his employers. When asked about his average monthly expenses, Appellant testified that "where I lived at I'd help my [other] daughter pay . . . different bills" and "give her as much as I could." Id. at 168. While his earnings were relatively low after he was released from incarceration, we conclude that the evidence supports a finding that Appellant was able to provide some support for K.L. but knowingly failed to do so under Ind. Code § 31-19-9-8(a)(2). See In re Adoption of M.A.S., 815 N.E.2d at 221 (noting the parent's employment and that the trial court found that the parent had sufficient income to pay something to meet his legal duty to pay support for the child, and concluding that, under the totality of the circumstances, the parent was able to provide support for the child but failed to do so);

18

Irvin, 712 N.E.2d at 1014 (holding that the parent's consent to an adoption was not necessary because he had failed to provide support for the child for more than one year).

Further, as to abandonment, the evidence most favorable to the court's determination as set forth above and in the record, namely, Appellant's failure to significantly communicate with or support K.L., establishes that Appellant abandoned or deserted K.L. under Ind. Code § 31-19-9-8(a)(1) and that at best he made only token efforts to support or to communicate with K.L. The court found that, "[a]fter [Appellant's] release in January 2013, he did not communicate at all with the child, in any manner, before the Petition for Adoption was filed," that "his asserted reasons of lack of means to visit with [K.L.] [were] spurious," and that Appellant "testified that he was employed, provided for his own shelter, clothing, food, and transportation, yet provided nothing for [K.L.] and expended no sums to try to see her." Appellant's Appendix at 16. See Ind. Code § 31-19-9-8(b) ("If a parent has made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent.").

In addition, as stated above, adoption is granted only if it is in the best interests of the child. See Ind. Code § 31-19-11-1(a). Appellant was released from incarceration on January 25, 2013, and was incarcerated again on October 18, 2013. The court noted that Appellant's lengthy criminal history includes recent convictions for operating a motor vehicle while intoxicated in 2013 and robbery as a class C felony in 2011. The trial court found that Adoptive Parents have three other children and an enormous, close-knit, extended family, all of whom accept K.L. as a member of the family, the extended families visit each week for gatherings lasting several hours, and that "[t]hese are the

19

only persons known to [K.L.] as family." Appellant's Appendix at 20. The court found that a Daviess County volunteer CASA familiar with Adoptive Parents' home testified as to "the wonderful care" that K.L. now receives, and that other foster children have benefited from being in Adoptive Parents' home. Id. The court found that the CASA had visited the home of Adoptive Parents many times and that there were no harsh words or physical punishments and that children were spoken to "in a loving caring manner." Id. at 21. The court further found that K.L. had regular visits to the doctor and dentist and that a nurse stated that K.L. had received excellent care in Adoptive Parents' home. The evidence includes certificates of completion related to adoption training by Adoptive Parents along with evidence of successful completion of courses for pediatric first aid/CPR/AED. The court also found Adoptive Parents have been licensed foster parents for several years and that they have passed background checks which are updated annually. The court noted that Adoptive Parents are capable of rearing and loving K.L. and providing suitable shelter, clothing, support and education for her, as they have virtually all of her life. Based upon the evidence most favorable to the trial court's decision, we cannot say that the evidence leads to a conclusion opposite that reached by the trial court regarding the best interests of K.L.

The trial court did not err in finding that Appellant, for a period of at least one year, failed to provide support for K.L. or failed to communicate significantly with her or that Appellant abandoned or deserted her for at least six months immediately preceding the date of the filing of the petition for adoption. Accordingly, Appellant's consent to the

20

adoption of K.L. by Adoptive Parents was not required pursuant to Ind. Code § 31-19-9-8. Further, the evidence established that the adoption was in the best interests of K.L.

II.

The next issue is whether the court failed to substantially comply with certain procedural requirements warranting reversal. Appellant argues that the record is devoid of a required supervision report and that thus the adoption should be set aside. Adoptive Parents argue that K.L. was not placed but that custody was given to them by K.L.'s biological mother through her power of attorney, that the failure to comply with the report provision was not a failure of substance, and that they were licensed foster parents subject to yearly background checks and had obtained certification requirements. They further note that the CASA volunteer observed the home of Adoptive Parents numerous times and reported that K.L. is a safe and happy child, and that a nurse performed monthly checks of K.L. over a two- to three-year period.

Ind. Code § 31-19-11-1(1)(a) provides that, when the court has heard evidence and finds, among other requirements, that "(3) the report of the investigation and recommendation under IC 31-19-8-5 has been filed," the court shall grant the petition for adoption and enter an adoption decree. Ind. Code § 31-19-8-1 provides that an adoption may be granted only after the court has heard the evidence and, "except as provided in section 2(c) of this chapter, a period of supervision, as described in section 2 of this chapter, by . . . a licensed child placing agency for a child who has not been adjudicated to be a child in need of services . . . ." Ind. Code § 31-19-8-2 provides:

21

(a) Except as provided in subsection (c), the period of supervision required by section 1 of this chapter may be before or after the filing of a petition for adoption, or both.

(b) The length of the period of supervision is within the sole discretion of the court hearing the petition for adoption.

(c) A court hearing a petition for adoption of a child may waive the period of supervision under subsection (a) if one (1) of the petitioners is a stepparent or grandparent of the child and the court waives the report under section 5(c) of this chapter.

Ind. Code § 31-19-8-5 provides in part:

Except as provided in subsection (c),[5] not more than sixty (60) days from the date of reference of a petition for adoption to each appropriate agency:

(1) each licensed child placing agency, for a child who is not adjudicated to be a child in need of services; or

(2) if the child is the subject of an open child in need of services action, each local office;

shall submit to the court a written report of the investigation and recommendation as to the advisability of the adoption.

Ind. Code § 31-19-8-8 provides: "The report and recommendation of the licensed child placing agency or local office are not binding on the court but are advisory only." The purpose of Indiana's adoption statutes is to protect and promote the welfare of children by providing them with stable family units. In re Adoption of K.S., 980 N.E.2d at 389.

The parties do not dispute that there was no agency report completed by a child placing agency and that no supervision period was specifically required by the court. K.L.'s biological mother executed a power of attorney giving Stepping Stones the authority and power to act in her stead in caring for K.L., Stepping Stones certified

_____

[5] Subsection (c) provides: "A court hearing a petition for adoption of a child may waive the report required under subsection (a) if one (1) of the petitioners is a stepparent or grandparent of the child and the court waives the period of supervision."

Adoptive Parents as power of attorney for biological mother, and Adoptive Parents were granted guardianship of K.L. We also note that Ind. Code § 31-19-8-2 provides in part that "[t]he length of the period of supervision is within the sole discretion of the court hearing the petition for adoption" and that Ind. Code § 31-19-8-8 provides that "[t]he report and recommendation of the licensed child placing agency or local office are not binding on the court but are advisory only." The evidence established that Adoptive Parents were licensed foster parents who submit to annual criminal background checks and that they obtained certain relevant certifications including first aid/CPR/AED and transracial/transcultural adoption training. The CASA indicated she had been to Adoptive Parent's residence at least every two months over the past several years, that she had observed K.L. since she was a baby, and that K.L. is happy and secure and loves being with the other children in Adoptive Parents' household. The CASA testified that Adoptive Parents' home is a calming environment and that there is no yelling or shouting. The registered nurse testified that she worked through the hospital but helped with the prison ministry system, that as part of her work she checked on the children, she performed monthly checks of K.L. at Adoptive Parents' home, there were no issues with K.L. other than routine infant illness, and that Adoptive Parents took good care of K.L.

Based upon the evidence as set forth above and in the record, including the testimony related to Adoptive Parents' care of K.L. and the observations of the CASA and nurse, we conclude there was substantial compliance with the procedural requirements of the adoption provisions and the purpose of the supervision period and report. See Horlock v. Oglesby, 231 N.E.2d 810, 815 (Ind. 1967) (noting that the

23

appellant alleged there was no period of supervision by a duly licensed child placing agency as required by statute and that the length of supervision was within the sole discretion of the court, holding that under the circumstances, including the length of time the child had lived with the appellees, there was sufficient compliance with the procedural requirements, and affirming the court's order granting the adoption). Appellant is not entitled to reversal on this basis.

CONCLUSION

For the foregoing reasons, we conclude that Appellant's consent to the adoption of K.L. by Adoptive Parents was not required pursuant to Ind. Code § 31-19-9-8, that the evidence established that the adoption was in the best interests of K.L., and that there was substantial compliance with the adoption procedural requirements. We affirm the decree of adoption entered by the trial court.

Affirmed.

BAILEY, J., and ROBB, J., concur.